FOR PUBLICATION

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| KEVIN KHOA NGUYEN, an individual, on behalf of himself and all others similarly situated, *Plaintiff-Appellee*, v. BARNES & NOBLE INC., *Defendant-Appellant*. | No. 12-56628 D.C. No. 8:12-cv-00812-JST-RNB OPINION |

Appeal from the United States District Court
for the Central District of California
Josephine L. Staton, District Judge, Presiding

Argued and Submitted
May 16, 2014—Pasadena, California

Filed August 18, 2014

Before: John T. Noonan and Kim McLane Wardlaw,
Circuit Judges, and Roslyn O. Silver, Senior District
Judge.[*]

Opinion by Judge Noonan

---

[*] The Honorable Roslyn O. Silver, Senior District Judge for the U.S. District Court for the District of Arizona, sitting by designation.

2           NGUYEN V. BARNES & NOBLE, INC.

## SUMMARY[**]

### Arbitration

The panel affirmed the district court's denial of Barnes & Noble, Inc.'s motion to compel arbitration and to stay court proceedings pursuant to an arbitration agreement contained in Barnes & Noble's website's Terms of Use, arising from a putative class action brought by a plaintiff whose order on the Barnes & Noble website for a Hewlett-Packard Touchpad was cancelled.

The Terms of Use on the Barnes & Noble website was part of a "browsewrap" agreement, where the website's terms and conditions of use were generally posted on the website via a hyperlink at the bottom of the screen.

The panel held that the plaintiff website user had insufficient notice of Barnes & Noble's Terms of Use, and thus did not enter into an agreement with Barnes & Noble to arbitrate his claims. The panel held that there was no evidence that the website user had actual knowledge of the agreement. The panel further held that where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on - without more - is insufficient to give rise to constructive notice. The panel also

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

held that the district court did not abuse its discretion in rejecting Barnes & Noble's estoppel argument.

**COUNSEL**

Michelle C. Doolin (argued), Leo P. Norton, and Erin E. Goodsell, Cooley LLP, San Diego, California, for Defendant-Appellant.

Gretchen Carpenter (argued), and Brian R. Strange, Strange & Carpenter, Los Angeles, California, for Plaintiff-Appellee.

**OPINION**

NOONAN, Circuit Judge:

Barnes & Noble, Inc. ("Barnes & Noble") appeals the district court's denial of its motion to compel arbitration against Kevin Khoa Nguyen ("Nguyen") pursuant to the arbitration agreement contained in its website's Terms of Use. In order to resolve the issue of arbitrability, we must address whether Nguyen, by merely using Barnes & Noble's website, agreed to be bound by the Terms of Use, even though Nguyen was never prompted to assent to the Terms of Use and never in fact read them. We agree with the district court that Barnes & Noble did not provide reasonable notice of its Terms of Use, and that Nguyen therefore did not unambiguously manifest assent to the arbitration provision contained therein.

We also agree with the district court that Nguyen is not equitably estopped from avoiding arbitration because he relied on the Terms of Use's choice of law provision.

We therefore affirm the district court's denial of Barnes & Noble's motion to compel arbitration and to stay court proceedings.

## I. Background

### A.

The underlying facts are not in dispute. Barnes & Noble is a national bookseller that owns and operates hundreds of bookstores as well as the website <www.barnesandnoble.com>. In August 2011, Barnes & Noble, along with other retailers across the country, liquidated its inventory of discontinued Hewlett-Packard Touchpads ("Touchpads"), an unsuccessful competitor to Apple's iPad, by advertising a "fire sale" of Touchpads at a heavily discounted price. Acting quickly on the nationwide liquidation of Touchpads, Nguyen purchased two units on Barnes & Noble's website on August 21, 2011, and received an email confirming the transaction. The following day, Nguyen received another email informing him that his order had been cancelled due to unexpectedly high demand. Nguyen alleges that, as a result of "Barnes & Noble's representations, as well as the delay in informing him it would not honor the sale," he was "unable to obtain an HP Tablet during the liquidation period for the discounted price," and was "forced to rely on substitute tablet technology, which he subsequently purchased . . . [at] considerable expense."

**B.**

In April 2012, Nguyen filed this lawsuit in California Superior Court on behalf of himself and a putative class of consumers whose Touchpad orders had been cancelled, alleging that Barnes & Noble had engaged in deceptive business practices and false advertising in violation of both California and New York law. Barnes & Noble removed the action to federal court and moved to compel arbitration under the Federal Arbitration Act ("FAA"), arguing that Nguyen was bound by the arbitration agreement in the website's Terms of Use.

The website's Terms of Use are available via a "Terms of Use" hyperlink located in the bottom left-hand corner of every page on the Barnes & Noble website, which appears alongside other hyperlinks labeled "NOOK Store Terms," "Copyright," and "Privacy Policy." These hyperlinks also appear underlined and set in green typeface in the lower left-hand corner of every page in the online checkout process.

Nguyen neither clicked on the "Terms of Use" hyperlink nor actually read the Terms of Use. Had he clicked on the hyperlink, he would have been taken to a page containing the full text of Barnes & Noble's Terms of Use, which state, in relevant part: "By visiting any area in the Barnes & Noble.com Site, creating an account, [or] making a purchase via the Barnes & Noble.com Site . . . a User is deemed to have accepted the Terms of Use." Nguyen also would have come across an arbitration provision, which states:

**XVIII. DISPUTE RESOLUTION**

Any claim or controversy at law or equity that arises out of the Terms of Use, the Barnes & Noble.com Site or any Barnes & Noble.com Service (each a "Claim"), shall be resolved through binding arbitration conducted by telephone, online or based solely upon written submissions where no in-person appearance is required. In such cases, arbitration shall be administered by the American Arbitration Association under its Commercial Arbitration Rules (including without limitation the Supplementary Procedures for Consumer-Related Disputes, if applicable), and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

. . . .

Any claim shall be arbitrated or litigated, as the case may be, on an individual basis and shall not be consolidated with any Claim of any other party whether through class action proceedings, class arbitration proceedings or otherwise.

. . . .

Each of the parties hereby knowingly, voluntarily and intentionally waives any right it may have to a trial by jury in respect of any litigation (including but not limited to any

NGUYEN V. BARNES & NOBLE, INC.                7

claims, counterclaims, cross-claims, or third party claims) arising out of, under or in connection with these Terms of Use. Further, each party hereto certifies that no representative or agent of either party has represented, expressly or otherwise, that such a party would not in the event of such litigation, seek to enforce this waiver of right to jury trial provision. Each of the parties acknowledges that this section is a material inducement for the other party entering into these Terms of Use.

Nguyen contends that he cannot be bound to the arbitration provision because he neither had notice of nor assented to the website's Terms of Use. Barnes & Noble, for its part, asserts that the placement of the "Terms of Use" hyperlink on its website put Nguyen on constructive notice of the arbitration agreement. Barnes & Noble contends that this notice, combined with Nguyen's subsequent use of the website, was enough to bind him to the Terms of Use. The district court disagreed, and Barnes & Noble now appeals.

## II. Standard of Review

"We review the denial of a motion to compel arbitration de novo." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008). Underlying factual findings are reviewed for clear error, *Balen v. Holland Am. Line Inc.*, 583 F.3d 647, 652 (9th Cir. 2009), while "[t]he interpretation and meaning of contract provisions" are reviewed de novo, *Milenbach v. Comm'r*, 318 F.3d 924, 930 (9th Cir. 2003).

### III. Discussion

### A.

The FAA, 9 U.S.C. § 1 *et seq.*, requires federal district courts to stay judicial proceedings and compel arbitration of claims covered by a written and enforceable arbitration agreement. *Id.* § 3. The FAA limits the district court's role to determining whether a valid arbitration agreement exists, and whether the agreement encompasses the disputes at issue. *See Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). The parties do not quarrel that Barnes & Noble's arbitration agreement, should it be found enforceable, encompasses Nguyen's claims. The only issue is whether a valid arbitration agreement exists.

In determining whether a valid arbitration agreement exists, federal courts "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Federal courts sitting in diversity look to the law of the forum state—here, California—when making choice of law determinations. *Hoffman v. Citibank (S.D.), N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008) (per curiam). Under California law, the parties' choice of law will govern unless section 187(2) of the Restatement (Second) of Conflict of Laws dictates a different result. *Id.*

Here, the parties agree that the validity of the arbitration agreement is governed by New York law, as specified by the Terms of Use's choice of law provision. But whether the choice of law provision applies depends on whether the parties agreed to be bound by Barnes & Noble's Terms of Use in the first place. As the district court acknowledged in

NGUYEN V. BARNES & NOBLE, INC.            9

its order, we need not engage in this circular inquiry because both California and New York law dictate the same outcome. Thus, in evaluating the validity of Barnes & Noble's arbitration agreement, we apply New York law, to the extent possible.

For the reasons that follow, we hold that Nguyen did not enter into Barnes & Noble's agreement to arbitrate.

**B.**

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004). One such principle is the requirement that "[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002) (applying California law).

Contracts formed on the Internet come primarily in two flavors: "clickwrap" (or "click-through") agreements, in which website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use; and "browsewrap" agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen. *See Register.com*, 356 F.3d at 428–30. Barnes & Noble's Terms of Use fall in the latter category.

"Unlike a clickwrap agreement, a browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly . . . [a] party instead gives his assent simply by using the website." *Hines v. Overstock.com, Inc.*,

10              NGUYEN V. BARNES & NOBLE, INC.

668 F. Supp. 2d 362, 366–67 (E.D.N.Y. 2009) (citation and quotation marks omitted) (alteration in original). Indeed, "in a pure-form browsewrap agreement, 'the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service.'" *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) (quoting *United States v. Drew*, 259 F.R.D. 449, 462 n.22 (C.D. Cal. 2009)). Thus, "by visiting the website—something that the user has already done—the user agrees to the Terms of Use not listed on the site itself but available only by clicking a hyperlink." *Id.* "The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." *Be In, Inc. v. Google Inc.*, No. 12-CV-03373-LHK, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013). "Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011) (citing *Sw. Airlines Co. v. BoardFirst, LLC*, No. 06-CV-0891-B, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007)); *see also* Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 477 (2006) ("Courts may be willing to overlook the utter absence of assent only when there are reasons to believe that the [website user] is aware of the [website owner's] terms.").

Were there any evidence in the record that Nguyen had actual notice of the Terms of Use or was required to affirmatively acknowledge the Terms of Use before

NGUYEN V. BARNES & NOBLE, INC.　　11

completing his online purchase, the outcome of this case might be different. Indeed, courts have consistently enforced browsewrap agreements where the user had actual notice of the agreement. *See, e.g.*, *Register.com*, 356 F.3d at 401–04 (finding likelihood of success on the merits in a breach of browsewrap claim where the defendant "admitted that . . . it was fully aware of the terms" of the offer); *Sw. Airlines Co.*, 2007 WL 4823761, at *4–6 (finding proper contract formation where defendant continued its breach after being notified of the terms in a cease and desist letter); *Ticketmaster Corp. v. Tickets.com, Inc.*, No. CV-997654, 2003 WL 21406289, at *2 (C.D. Cal. Mar. 7, 2003) (denying defendants' summary judgment motion on browsewrap contract claim where defendants continued breaching contract after receiving letter quoting the browsewrap contract terms). Courts have also been more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement—that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website. *See, e.g.*, *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 451–52 (E.D.N.Y. 2013) (enforcing forum selection clause where prospective members had to check box confirming that they both read and agreed to the website's Terms and Conditions of Service to obtain account); *Fteja*, 841 F. Supp. 2d at 838–40 (enforcing forum selection clause in website's terms of service where a notice below the "Sign Up" button stated, "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service," and user had clicked "Sign Up").

But where, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of

the contract. *Specht*, 306 F.3d at 30–31; *see also In re Zappos.com, Inc. Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012). Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the design and content of the website and the agreement's webpage. *Google*, 2013 WL 5568406, at *6. Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement. *See, e.g.*, *Specht*, 306 F.3d at 23 (refusing to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *In re Zappos.com*, 893 F. Supp. 2d at 1064 ("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com webpage among many other links, and the website never directs a user to the Terms of Use."); *Van Tassell*, 795 F. Supp. 2d 792–93 (refusing to enforce arbitration clause in browsewrap agreement that was only noticeable after a "multi-step process" of clicking through non-obvious links); *Hines*, 668 F. Supp. 2d at 367 (plaintiff "could not even see the link to [the terms and conditions] without scrolling down to the bottom of the screen—an action that was not required to effectuate her purchase"). On the other hand, where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements. *See, e.g.*, *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04-04825, 2005 WL 756610, at *2, *4–5 (N.D. Cal. Apr. 1, 2005) (enforcing forum selection clause in website's terms of use where every page on the website had a textual notice that read: "By continuing past this page and/or using this site, you agree to abide by the Terms of Use for this site, which prohibit commercial use of any information on this site"). *But*

*see Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d 974, 981 (E.D. Cal. 2000) (refusing to enforce browsewrap agreement where textual notice appeared in small gray print against a gray background). In short, the conspicuousness and placement of the "Terms of Use" hyperlink, other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement.

Barnes & Noble argues that the placement of the "Terms of Use" hyperlink in the bottom left-hand corner of every page on the Barnes & Noble website, and its close proximity to the buttons a user must click on to complete an online purchase, is enough to place a reasonably prudent user on constructive notice. It is true that the location of the hyperlink on Barnes & Noble's website distinguishes this case from *Specht*, the leading authority on the enforceability of browsewrap terms under New York law. There, the Second Circuit refused to enforce an arbitration provision in a website's licensing terms where the hyperlink to the terms was located at the bottom of the page, hidden below the "Download" button that users had to click to initiate the software download. *See Specht*, 306 F.3d at 30. Then–Second Circuit Judge Sotomayor, writing for the panel, held that "a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms." *Id.* at 32. By contrast, here the "Terms of Use" link appears either directly below the relevant button a user must click on to proceed in the checkout process or just a few inches away. On some pages, the content of the webpage is compact enough that a user can view the link without scrolling. On the remaining pages, the hyperlink is close enough to the "Proceed with Checkout"

14       NGUYEN V. BARNES & NOBLE, INC.

button that a user would have to bring the link within his field of vision in order to complete his order.

But the proximity or conspicuousness of the hyperlink alone is not enough to give rise to constructive notice, and Barnes & Noble directs us to no case law that supports this proposition.[1] The most analogous case the court was able to locate is *PDC Labs., Inc. v. Hach Co.*, an unpublished district court order cited by neither party. No. 09-1110, 2009 WL 2605270 (C.D. Ill. Aug. 25, 2009). There, the "Terms [and Conditions of Sale] were hyperlinked on three separate pages of the online . . . order process in underlined, blue, contrasting text." *Id.* at *3. The court held that "[t]his contrasting text is sufficient to be considered conspicuous," thereby placing a reasonable user on notice that the terms applied. *Id.* It also observed, however, that the terms' conspicuousness was reinforced by the language of the final checkout screen, which read, "'STEP 4 of 4: *Review terms*, add any comments, and submit order,'" and was followed by a hyperlink to the Terms. *Id.* (emphasis added).

---

[1] Indeed, in cases where courts have relied on the proximity of the hyperlink to enforce a browsewrap agreement, the websites at issue have also included something more to capture the user's attention and secure her assent. *See, e.g.*, *5381 Partners LLC v. Sharesale.com, Inc.*, No. 12-CV-4263 JFB AKT, 2013 WL 5328324, at *7 (E.D.N.Y. Sept. 23, 2013) (in addition to hyperlink that appeared adjacent to the activation button users had to click on, website also contained a text warning near the button that stated "By clicking and making a request to Activate, you agree to the terms and conditions in the [agreement]"); *Zaltz*, 952 F. Supp. 2d at 451–52 (users required to check box confirming that they had reviewed and agreed to website's Terms and Conditions, even though hyperlink to Terms and Conditions was located on the same screen as the button users had to click on to complete registration).

NGUYEN V. BARNES & NOBLE, INC.    15

As in *PDC*, the checkout screens here contained "Terms of Use" hyperlinks in underlined, color-contrasting text. But *PDC* is dissimilar in that the final screen on that website contained the phrase "Review terms." *PDC Labs*, 2009 WL 2605270, at *3. This admonition makes *PDC* distinguishable, despite the court's explanation that the blue contrasting hyperlinks were sufficiently conspicuous on their own. That the *PDC* decision couched its holding in terms of procedural unconscionability rather than contract formation further distinguishes it from our case. *See id.*

In light of the lack of controlling authority on point, and in keeping with courts' traditional reluctance to enforce browsewrap agreements against individual consumers,[2] we therefore hold that where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice. While failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract, *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 11 (1988), the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers. Given the breadth of the range of technological savvy of online purchasers, consumers

---

[2] *See* Woodrow Hartzog, *Website Design as Contract*, 60 Am. U. L. Rev. 1635, 1644 (2011) (observing that courts "tend to shy away from enforcing browsewrap agreements that require no outward manifestation of assent"); Lemley, 91 Minn. L. Rev. at 472–77 ("An examination of the cases that have considered browsewraps in the last five years demonstrates that the courts have been willing to enforce terms of use against corporations, but have not been willing to do so against individuals.").

16   NGUYEN V. BARNES & NOBLE, INC.

cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound.

Barnes & Noble's argument that Nguyen's familiarity with other websites governed by similar browsewrap terms, including his personal website <www.kevinkhoa.com>, gives rise to an inference of constructive notice is also of no moment. Whether Nguyen has experience with the browsewrap agreements found on other websites such as Facebook, LinkedIn, MySpace, or Twitter, has no bearing on whether he had constructive notice of Barnes & Noble's Terms of Use. There is nothing in the record to suggest that those browsewrap terms are enforceable by or against Nguyen, much less why they should give rise to constructive notice of Barnes & Noble's browsewrap terms.

## C.

Barnes & Noble argues in the alternative that the district court erroneously rejected its argument that Nguyen should be equitably estopped from avoiding arbitration because he ratified the Terms of Use by relying on its choice of law provision in his complaint and asserting class claims under New York law. Reviewing the district court's decision for abuse of discretion, *Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1195 (9th Cir. 2008), we reject Barnes & Noble's argument for two reasons.

First, the doctrine of direct benefits estoppel does not apply to the facts at hand. Federal courts have recognized that the obligation to arbitrate under the FAA does not attach only to one who has personally signed the arbitration provision. *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773,

NGUYEN V. BARNES & NOBLE, INC.            17

776 (2d Cir. 1995). Instead, a non-signatory to an arbitration agreement may be compelled to arbitrate where the non-signatory "knowingly exploits" the benefits of the agreement and receives benefits flowing directly from the agreement. *See MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001); *see also Belzberg v. Verus Invs. Holdings Inc.*, 999 N.E.2d 1130, 1134 (N.Y. 2013). But Nguyen is not the type of non-signatory contemplated by the rule. Equitable estoppel typically applies to third parties who benefit from an agreement made between two primary parties. *See, e.g.*, *Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 267–68 (5th Cir. 2004) (estopping non-signatory wife of borrower from avoiding arbitration clause of loan agreement made between her husband and lender); *Parillo v. Nataro*, 229 N.Y.S.2d 492, 493–94 (Sup. Ct. 1962) (applying equitable estoppel to third-party beneficiary of insurance contract). Here, Nguyen is not a third-party beneficiary to Barnes & Noble's Terms of Use, and whether he is a primary party to the Terms of Use lies at the heart of this dispute.

Second, we are unable to find any case law holding that reliance on a contract's choice of law provision in itself constitutes a "direct benefit." The closest case is *HD Brous & Co., Inc. v. Mrzyglocki*, an unpublished district court decision, in which the court compelled arbitration against a non-signatory petitioner in part because the non-signatory had sought to limit the respondent's choice of substantive law by relying on the agreement's choice of law provision. No. 03 Civ.8385(CSH), 2004 WL 376555, at *8 (S.D.N.Y. Feb. 26, 2004). But *HD Brous* is distinguishable because the agreement there served as the foundational document for the business relationship between the parties and explicitly named the petitioner as the intended beneficiary. *Id.* It can

hardly be said here that the choice of New York law—chosen unilaterally by Barnes & Noble—was intended to benefit Nguyen. Any benefit derived by Nguyen under New York law—whether it be the possibility of statutory or treble damages on Nguyen's nationwide class claims—is merely incidental.

In light of these distinguishing facts, the district court did not abuse its considerable discretion in rejecting Barnes & Noble's estoppel argument.

\* \* \*

We hold that Nguyen had insufficient notice of Barnes & Noble's Terms of Use, and thus did not enter into an agreement with Barnes & Noble to arbitrate his claims.

**AFFIRMED.**